IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RONALD SHAVER, WILLIAM J.        )
WHITNEY, JOE FEDELE, RALPH       )
RIBERICH and ANTHONY P. KANZ,    )
on behalf of themselves and      )
others similarly situated        )
                                 )
            Plaintiffs,           )     Civil Action No. 02-1424
                                 )     Judge David S. Cercone/
        vs.                      )     Magistrate Judge Sensenich
                                 )
SIEMENS CORPORATION, and         )
SIEMENS WESTINGHOUSE             )     Re:  Docs. #53, #60
RETIREMENT PLAN FOR UNION        )
EMPLOYEES, and SIEMENS           )
WESTINGHOUSE RETIREMENT PLAN     )
                                 )
            Defendants.           )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is recommended that Defendants' Motion for Summary Judgment be granted as to the class members who signed a release. It is further recommended that Plaintiffs' Cross Motion for Summary Judgment be granted as to each of the class members who did not sign a release.[1]

### II.   REPORT

Ronald Shaver, William J. Whitney, Joe Fedele, Ralph Riberich and Anthony P. Kanz on behalf of themselves and others

---

[1] If this Report and Recommendation is adopted as the opinion of the Court, the class member who have not signed a release will have established liability.

similarly situated, ("Plaintiffs"), bring this class action against Siemens Corporation and Siemens Westinghouse Retirement Plans ("Defendants"). Plaintiffs allege that Defendants violated the Employee Retirement Income Security Act of 1974,("ERISA") because they eliminated Permanent Job Separation pension benefits ("PJS benefits") to which they were entitled, in violation of the anti-cutback provision of ERISA, Section 204(g) codified at 29 U.S.C. § 1054(g) and the spinoff provision of ERISA, Section 208, codified at 29 U.S.C. § 1058.

### A.   Factual Background[2]

On November 14, 1997, Siemens Corporation (Siemens) entered into an agreement with Westinghouse Electric Corporation[3] (Westinghouse) for the sale of Westinghouse's Power Generation Business Unit (PGBU). This agreement, the Asset Purchase Agreement (APA), provided that Siemens would hire all Westinghouse PGBU employees who, on that day, were actively working, on vacation, or were on short term disability. (See Doc. #57, ex 1 at bates sw 10769-70.) Plaintiffs are such employees. The APA contained specific terms regarding the pensions of these

---

[2] The parties filed a joint statement of undisputed facts from which these facts were taken mostly verbatim, unless another source is noted. (Doc. #56.)

[3] Westinghouse Electric Corporation changed its name to CBS, Inc., and is now known as Viacom, Inc., but will be referred to herein as "Westinghouse"  (*See* Compl. ¶ 1.)

transferred employees. (Id. at sw 10771-74.) Additionally, the APA provided under Section 5.5(d)(i) that the pension plan offered by Siemens was contractually required to include terms and conditions which were "substantially identical" to all substantive provisions of the Westinghouse Plan in effect on the closing date. (Id. at sw 10771.)

On August 19, 1998, the sale of assets was completed and the employees were hired by Siemens pursuant to the APA. On the day of the sale, the parties amended the APA to establish that September 1, 1998 was the official closing date for pension purposes. (See Doc. 57, ex 1D at p. 12.)  This pension closing date coincided with an amendment in the Westinghouse Plan (the 1994 amendment), which among other things, provided that the PJS benefits offered under the Westinghouse Plan were no longer available after August 31, 1998 (the sunset provision). Therefore, on the pension closing date of September 1, 1998, the PJS benefits which had been available under the Westinghouse Plan were no longer available due to the sunset provision. Defendants argue that they fulfilled their contractual duty under the APA to provide substantially identical benefits.

In a subsequent case addressing the 1994 amendments to the Westinghouse Plan, Bellas v. CBS, Inc., the court held that to the extent that Permanent Job Separation (PJS) benefits included "the lifetime provision of a normal retirement benefit commencing after a covered job loss" they were protected by §204 of ERISA.

3

221 F.3d 517, 540 (3d Cir. 2000) *cert. denied*, 531 U.S. 1104
(2001). On the other hand, to the extent that they "did not
continue beyond normal retirement age" they were not protected by
Section 204(g). Id. The Court found that pension benefits
continued for the lifetime of the employee and therefore were
both an early retirement type benefits and an early retirement
type subsidy which were protected, while other benefits which
were payable at the age of 62 were not protected. Id. Since the
court held that the PJS benefits were protected by ERISA § 204(g)
and could not be eliminated, the court invalidated the 1994 plan
amendments' elimination of the PJS benefits as of September 1,
1998.

Before and after the sale to Siemens, Westinghouse
sponsored, funded and administered its own pension plan which
provided eligible Westinghouse employees with pension benefits.
Under the terms of the APA, the Westinghouse Plan retained
liability for benefits accrued by the PGBU employees before
September 1, 1998 under its Plan. Eligible employees would
receive two pension checks, one for benefits accrued before
September 1, 1998 from the Westinghouse Plan, and one for
benefits accrued after that date from the Siemens Plans.

On October 29, 1998, Siemens adopted separate but virtually
identical defined employee benefit documents for union and non-
union employees ("Siemens Plans"), which were made effective

4

retroactively to September 1, 1998. The Siemens Plans did not provide for any PJS benefits at any time.[4]

In 1999, Siemens terminated Plaintiffs' employment for lack of work with no expectation of recall. (Doc. #1 at ¶¶ 32, 34, Doc. # 21 at ¶32.)  Defendants do not claim that Plaintiffs have not met all the requirements to receive PJS pension benefits under the terms of the Westinghouse Plan.  (Doc. #1 at ¶ 34). Plaintiffs made claims for PJS benefits under the Siemens Plans, but Defendants denied them on the grounds that the Siemens Plans did not provide PJS benefits. (Doc. #1 at ¶ 34, Doc. # 21 at ¶ 32.) Plaintiffs, thereafter, initiated this suit.

Plaintiffs' Complaint alleges that Siemens was required to provide PJS benefits due to "its promise in the [APA] and because of ERISA requirements relating to 'spin-off' pension plans." (Doc. #1 at ¶ 3.) Defendants filed a Motion for Summary Judgment (Doc. # 53) denying that they had cut back any of Plaintiffs' benefits, that the benefits Plaintiffs seek are damages that are not available under ERISA section 502 (a)(1)(B), and that approximately 200 of the Plaintiffs' class members have signed releases which bar them from recovery. Plaintiffs subsequently

---

[4]  The assets listed as acquired by Siemens in the APA do not include the Westinghouse Plan. Siemens did not agree to assume the collective bargaining agreements that included PJS benefits between Westinghouse and the International Brotherhood of Electrical Workers, but Siemens entered into its own negotiations with IBEW, and ratified a collective bargaining agreement which did not include PJS benefits.

filed a Cross Motion for Summary Judgment as to Defendants'
liability (Doc. # 60).

Plaintiffs' brief in support of their Motion for Summary
Judgment as to Liability asserts that the Asset Purchase
Agreement ("APA") must be considered the "governing plan
document" from August 1998 until at least October 29, 1998, when
Siemens adopted new plan documents. (Doc. #61 at 23.) Plaintiffs
maintain that the October documents violated the terms of the
APA, and the anti-cutback provision of ERISA Section 204(g).
Plaintiffs also claim that the Siemens Plans were required to
continue the pension benefits which were contained in the
Westinghouse Plan. Thus, Plaintiffs point to ERISA Section 208
which mandates that when a plan's assets or liabilities are
transferred in connection with a sale, the purchaser's plan must
provide, at minimum, benefits equal to those available under the
seller's plan.

Defendants' Motion for Summary Judgment argues that the
Siemens Plans were new plans, not amendments subject to the anti-
cutback rule. Defendants also claim that the APA has no bearing
on the benefits provided to Plaintiffs. Defendants reason that
the Siemens Plans are not "spin-offs" of the Westinghouse Plan
because there was no merger, consolidation or transfer of
Westinghouse Plan assets or liabilities. (Doc. # 55, ex 1).
Finally, Defendants aver that many members of the class have
signed releases which prohibit their participation in this case,

6

and that the Plaintiffs' claim for damages is prohibited by
ERISA.

### B.   Standard for Summary Judgment

Summary judgment is appropriate if, drawing all inferences
in favor of the non-moving party, "the pleadings, depositions,
answers to interrogatories and admissions on file, together with
the affidavits, if any, show that there is no genuine issue of
material fact and the movant is entitled to judgment as a matter
of law."   FED.R.CIV.P. 56(c).  Summary judgment may be granted
against a party who fails to adduce facts sufficient to establish
the existence of any element essential to that party's case, and
for which that party will bear the burden of proof at trial.
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving
party bears the initial burden of identifying evidence which
demonstrates the absence of a genuine issue of material fact.
Once that burden has been met, the non-moving party must set
forth "specific facts showing that there is a genuine issue for
trial" or the factual record will be taken as presented by the
moving party and judgment will be entered as a matter of law.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986).  An issue is genuine only if the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party.  Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248

(1986).

      **C.**   **Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and exclusive jurisdiction without regard to amount in controversy pursuant ERISA Section 502 (e), codified at 29 U.S.C. 1132(e) (2005).

    **D.**   **Discussion**

The parties have filed cross motions for summary judgment raising multiple issues. Plaintiffs assert that Defendants are liable for PJS benefits under ERISA Sections 204(g) and 208. Defendants argue that these provisions do not apply to the facts of this case.

The central and rather narrow issue in this case is whether Westinghouse and Siemens accomplished one of their objectives in the APA- to deprive transferred employees of the PJS benefit to which they were entitled as Westinghouse employees without violating ERISA Sections 204(g) and 208. It is my conclusion that they did not succeed in accomplishing that objective and that the APA, together with the Siemens Plans, deprives the transferred employees of PJS benefits to which they are entitled under ERISA.

**1. Plaintiffs' Motion for Summary Judgment**

Plaintiffs assert that Defendants violated ERISA Sections

8

204(g) and 208 when the Siemens Plans failed to provide them with the same PJS benefits which were provided in the Westinghouse Plan.

The proper starting point for all ERISA benefit claims is acknowledging that:

> Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits.... [W]hen Congress enacted ERISA, it 'wanted to ... mak[e] sure that if a worker has been promised a defined pension benefit upon retirement--and if he has fulfilled whatever conditions are required to obtain a vested benefit-- he actually will receive it.'

Central Laborers' Pension Fund v. Heinz, 124 S.Ct. 2230, 2235 (2004) (internal citations omitted). When a court considers a claim for benefits under ERISA, the Plan in question is interpreted under principles of contract law. La Fata v. Raytheon Co., 302 F.Supp.2d 398, (E.D.Pa. 2004). "Consequently, we are required to enforce the plan as written unless we can find a provision of ERISA that contains a contrary directive." Smith v. Contini, 205 F.3d 597, 602 (3d Cir. 2000)(internal citations omitted).

In this case, the Westinghouse Plan, as amended in 1994, did not provide PJS benefits after September 1, 1998 and the Siemens Plans do not provide PJS benefits. Therefore, unless required by ERISA, Siemens was free to adopt its Plans without

providing PJS benefits.

Plaintiffs assert that two provisions of ERISA require Siemens to provide them with PJS benefits. The first is the anti-cutback provision of ERISA Section 204(g). The second is the spinoff provision of ERISA Section 208. Each provision raises an issue of first impression.

**a. The Spinoff Plan Argument under Section 208, 29 U.S.C. §1058**

ERISA prohibits a plan merger, consolidation or transfer of assets or liabilities to another plan:

> unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer (if the plan had then terminated).

29 U.S.C. §1058, (also referred to as § 208).  Section 208 applies only when a qualifying pension event (a merger, consolidation, or transfer) triggers its applicability. The parties stipulated that this case does not involve a plan merger, consolidation or transfer of plan assets within the meaning of ERISA. (Doc. # 56 at ¶¶10-12.) However, they disagree on whether there was a transfer of plan liabilities. Plaintiffs assert that Section 208 applies because in the APA the Siemens Plans assumed the PJS pension liabilities of the Westinghouse Plan. Plaintiffs

10

claim that Section 208 applies to this alleged "spin off" because by its terms it applies to a transfer of plan assets **or liabilities.** (Doc. # 61 at 18.)

Defendants respond that they were free under Section 208 of ERISA to create a plan without PJS benefits because there was no transfer of Plan liabilities under the APA. (Doc. #55, ex 1 at 23-28.) They cite the same documents cited by Plaintiffs but argue that they show the APA did not transfer liabilities to them.[5] (Id. at 12-20.)

The Court shall begin its analysis by considering the express terms of the APA, which provides:

> Section 2.3 Assumption of Liabilities.
> (a) Assumed Liabilities... Purchaser hereby agrees to assume, effective as of the Closing, and agrees to pay, perform and discharge when due all of the following Liabilities of Sellers (except Excluded Liabilities) arising out of, relating to or otherwise in respect of the Acquired Assets, the Business or the operations of the Business before, on or after the Closing Date (collectively, the "<u>Assumed Liabilities</u>"):
>
> ...
>
> (vi) All Liabilities relating to the employment or termination of employment of any employee or former employee of the Business;

---

[5] Defendants' assertion that the Plan Administrator's determination to deny benefits deserves deference is wrong. The issue presented in this case involves statutory and contractual interpretation -whether the APA as implemented violated ERISA-not whether the Administrator's interpretation of the Plans was arbitrary or capricious. See <u>Caldwell v. Life Ins. Co. of North America</u>, 287 F.3d 1276, 1283 (10th Cir 2002), and <u>McDaniel v. Chevron Corp.</u>, 203 F.3d 1099 (9th Cir. 2000). Defendants' argument that Siemens Plans were intentionally drafted not to offer PJS benefits is irrelevant.  The issue is whether ERISA required Siemens to offer PJS benefits.

(vii) All Liabilities arising under or in connection
with any Plan or Benefit Arrangement;
                    ...
(b) Excluded Liabilities...
                    ...
(x) any Liabilities with respect to Plans and Benefit
Arrangements retained by [Westinghouse] under Section
5.5; and
(xi) any other Liabilities not assumed by Section 2.3
(a).

(Doc. #57, ex.1 at 21-23.) The general provision regarding
assumption of liabilities states that Siemens, as the purchaser,
has assumed all liabilities relating to plan or benefit
arrangements, with the exception of the liabilities that
Westinghouse has retained under Section 5.5. of the APA.

Section 5.5 of the APA, captioned "Employee Matters" reads
in relevant part:

> (d) <u>Pension Plan</u>. (i) Effective as of the Closing Date
> [September 1, 1998] Purchaser shall establish a defined
> pension plan intended to qualify under Section 401(a)
> of the Code for the benefit of Business Employees (the
> "<u>purchaser pension plan</u>") *that contains terms and
> conditions that are substantially identical with
> respect to all substantive provisions to those of the
> Westinghouse Pension Plan as in effect as of the
> Closing Date... provided however*, that the Purchaser
> Pension Plan will include provisions which are
> consistent with (ii) through (iv) below and will be
> administered during the Benefit Maintenance period so
> that the aggregate of the benefits under the
> [Westinghouse] Pension Plan and the Purchaser Pension
> Plan are *the same with respect to Business Employees as
> if the Business Employees continued employment with
> Sellers*.

(Id. at 56-57.)(italics added). The above Section 5.5(d)(i)
provides that the parties have contracted to provide

12

'substantially identical' benefits to the transferred employees. The meaning of 'substantially identical' can be gleaned from the surrounding language of the same provision, specifically that administration of the Siemens Plans is to provide benefits that are "the same with respect to Business Employees *as if the Business Employees continued employment with Sellers*." (Id. at 56.)(emphasis added). The measuring date for determining whether the Plans were 'substantially identical' was the Closing Date, later defined as September 1, 1998 in the August 19, 1998 amendment to the APA.  (See Id., Ex. 1D at 12.)

As a general matter, the contractual obligation to provide substantially identical benefits to the transferring employees can be construed to be a transfer of Plan liability. This provision requires Siemens to provide benefits by contractual agreement.

Section 5.5(d)(i) sets forth above in general the terms the Siemens Plans are required to offer, but this provision is supplemented by subsections (ii) through (iv). (Doc. #57, Ex. 1 at 56-58.) Subsection (ii) requires Siemens to continue its Pension Plans "without adverse effect to the Business Employees for a period not less than the Benefits Maintenance Period." (Id. at 56.)  Subsection (iii) requires the Westinghouse Plan to "retain liability with respect to Business Employees for their accrued benefit calculated as of the Closing Date" of September

13

1, 1998. (Id. at 56-57.)  Subsection (d)(iv) provides that the
Siemens Plans "shall be solely responsible for" certain pension
benefits for employees who retire after September 1, 1998. (Id.
at 57-58.) The language of subsection (iii) provides that
Westinghouse retains liability for the employees' accrued
benefits calculated as of September 1, 1998, and the only three
exceptions to this provision are listed in subsection (iv).

Under Section 2.3 of the APA, Siemens assumed "[a]ll
Liabilities arising under or in connection with any Plan or
Benefit Arrangement" except for Liabilities retained by
Westinghouse in Section 5.5 (d)(iii). Defendants' contention that
the term "responsibility" is distinguishable from the term
"liabilities" is not substantiated by the terms of the APA. Under
section 2.3(a)(vii) Siemens assumed all liabilities arising under
or in connection with any Plan or Benefit Arrangement." (Id. at
22.) Section 5.5(d)(iv) states that "[t]he Purchaser Pension Plan
shall be solely responsible for (and the [Westinghouse] Pension
Plan shall not provide for)..." these liabilities. (Id. at 57.)

Section 208 does not contain a definition of transfer of
liabilities. A definition is not provided under ERISA. However,
there is a useful definition in corresponding Treasury
Regulations:

> A 'transfer of assets or liabilities' occurs when there
> is a diminution of assets or liabilities with respect
> to one plan and the acquisition of these assets or the
> assumption of these liabilities by another plan. For
> example, the shifting of assets or liabilities pursuant

> to a reciprocity agreement between two plans in which
> one plan assumes liabilities of another plan is a
> transfer of assets or liabilities.

26 CFR § 1.414(l)-1(b)(3)(2005). The pension plan liabilities of

Westinghouse were reduced in the APA Sections 2.3(a)(vii) and

5.5(d)(iv) by its transfer of responsibility for specific post-

closing benefits to Siemens and its retention of liability only

for accrued benefits calculated as of the closing date under

Section 5.5(d)(iii). Siemens' Plans assumed all liabilities not

retained by Westinghouse under the terms of Section 2.3. Thus,

liabilities were transferred between the Plans.[6]

The APA provides for transfer of liabilities transferred

between the Plans, and thus Section 208 requires that the Siemens

Plans offer benefits equal to those in the Westinghouse Plan.

Siemens Plans do not include PJS benefits. Thus, Section 204(g)

must be evaluated to determine whether Siemens improperly amended

its Plan on September 1, 1998 to eliminate the protected PJS

benefits.

### b. ERISA's Anti-Cutback Provision

The anti-cutback provision of ERISA, Section 204(g) codified

---

[6] The parties have not demonstrated that a transfer of
liabilities specifically for the PJS benefits is necessary in
order for Section 208 to apply. The language of Section 208 does
not require that liability for the specific benefit for which the
suit is brought be transferred to the purchaser's plan.  Hence,
Siemens' express assumption of <u>any</u> Plan liabilities would appeal
to satisfy Section 208.

at 29 U.S.C. § 1054(g) provides:

> Decrease of accrued benefits through amendment of plan
> (1) The accrued benefit of a participant under a plan
> may not be decreased by an amendment of the plan...
> (2) For purposes of paragraph (1), a plan amendment
> which has the effect of--
> (A) eliminating or reducing an early retirement benefit
> or a retirement-type subsidy (as defined in
> regulations), or
> (B) eliminating an optional form of benefit,
> with respect to benefits attributable to service before
> the amendment shall be treated as reducing accrued
> benefits. In the case of a retirement-type subsidy, the
> preceding sentence shall apply only with respect to a
> participant who satisfies (either before or after the
> amendment) the preamendment conditions for the subsidy.

29 U.S.C. §1054(g)(ERISA section 204(g)). The statute imposes

three requirements for a cutback claim: 1) the benefit must be an

accrued benefit of a plan participant, 2) the benefit must have

been decreased or eliminated by an amendment to the plan, and 3)

if the benefit was an early retirement-type subsidy, any pre-

amendment conditions must have been satisfied. See Id.

In this case, the PJS benefits at issue qualify as both a

subsidy and an early retirement benefit. See Bellas v. CBS, Inc.,

221 F.3d at 538. Although the Plaintiffs must establish that pre-

amendment conditions have been satisfied to recover the entire

benefit, Plaintiffs do not need to establish this element as to

the portion of the PJS benefit which was found to be a early

retirement benefit. See Id. and 29 U.S.C. §1054(g)(1)(B). Thus,

only a portion of the PJS benefits are retirement-type subsidies

under Bellas. There is no question that the PJS benefits which

16

were included in the Westinghouse Plan were not included in the Siemens Plans. The two primary issues in the Section 204(g) claim are whether the PJS benefits were accrued benefits of a plan participant and thereby protected under Section 204(g) and whether a plan amendment occurred.

**(i).  The benefit at issue is a protected accrued benefit of a plan participant**

**(a).  Protected Benefits were Cut back as a Matter of Law**

In <u>Bellas</u>, a case involving the Westinghouse pension plan, Chief District Judge Ambrose found as a matter of law that Westinghouse violated the anti-cutback provisions of ERISA when it amended its Plan in 1994 to change the definition of the PJS benefits and to terminate PJS benefits after August 31, 1998. <u>Bellas v. CBS, Inc.</u>, 73 F.Supp. 2d 500, 511 (W.D. Pa. 1999) affirmed 221 F.3d 517 (3d Cir. 2000). The Court of Appeals for the Third Circuit affirmed Judge Ambrose' findings and held that because the PJS benefits continued beyond normal retirement age they "accrued upon their creation rather than upon the occurrence of the unpredictable contingent event" and thus were protected by the anti-cutback provision of ERISA. <u>Bellas</u>, 221 F.3d at 532.

<u>Bellas</u> involved the same PJS benefits that are at issue in this case and that were determined to be accrued benefits and therefore protected under Section 204(g) by both Judge Ambrose

17

and the Court of Appeals. See 73 F.Supp.2d at 501, 221 F.3d at 532, and Doc. 57, ex 5 at sw 10539-44.[7]  Further, the 1994 amendment of the Westinghouse Plan, which creates the September 1, 1998 "sunset" provision upon which Defendants rely, was found to be an illegal cutback in <u>Bellas</u>. (See Doc. #55, ex 1 at 2.)

Therefore, as a matter of law the PJS benefit is an accrued benefit, and therefore protected from cutback under Section 204(g) and the 1994 amendment was an illegal cutback under Section 104(g). See <u>Bellas v. CBS, Inc.</u>, 221 F.3d 517.


**(b). The PJS benefits were an "accrued benefit of a participant in <u>a</u> plan"**

Plaintiffs were participants in both the Siemens Plans and the Westinghouse Plan. (Doc. # 56 at ¶¶ 3-8.) Plaintiffs assert that the APA is the Plan which was cut back by the adoption of the written version of the Siemens Plans by October 29, 1998. (Doc. #61 at 26-27.) Specifically, Plaintiffs assert that the APA was the plan document which was in effect for the two months between the closing date of the APA on August 19, 1998 and October 29, 1998, the date the Siemens Plans were adopted. (Id. at 14-15.) Defendants counter that the APA could not be considered a plan document because it contained a "no third party

---

[7] The parties have not provided this Court with the Westinghouse Pension Plan as it existed before the 1994 amendments, but it is discussed and set forth in <u>Bellas</u> at 519.

beneficiaries" clause. (Doc. #63 at 5.) Further, Defendants admit that the APA requires that their Plans be substantially identical to the Westinghouse Plan at the Closing Date-September 1, 1998 and argue that their Plans were "substantially identical" to the Westinghouse Plan because on that date the Westinghouse Plan contained no PJS benefits.(Id. at 5-6). Therefore, Defendants conclude that the APA did not require it to provide PJS benefits to the employees transferred to them by Westinghouse. (Id. at 6.)

The parties do not dispute that from August 19, 1998 to September 1, 1998 the Plaintiffs were Siemens Employees although the Siemens Plans were not effective until October 29, 1998. (See Doc. 56 at ¶¶ 6-7). Employees who later qualify for pension benefits (other than PJS benefits), receive benefits under the Westinghouse Plan for benefits accrued prior to September 1, 1998 and a separate check from Siemens for  benefits accrued after August 31, 1998. (Id. at ¶8.) Therefore, for the thirteen day period from August 19, 1998 to August 31, new Siemens employees (from Westinghouse) were provided benefits under the Westinghouse Plan pursuant to an arrangement between the companies contained in the APA. These Siemens employees had protected PJS benefits under the terms of this agreement.

The APA does not qualify as a plan document. The Court of Appeals for the Third Circuit has adopted and applied a test to resolve the issue of what is a "plan" under ERISA. See <u>Deibler v. United Food & Comm. Workers' Local Union 23</u>, 973 F.2d 206, 209

(3d Cir. 1992) adopting the test established in <u>Donovan v.</u>
<u>Dillingham</u>, 688 F.2d 1367 (11th Cir. 1982).

In this Circuit, informal written communications will
constitute a plan if the Court determines "from the surrounding
circumstances [that] a reasonable person could ascertain the
intended benefits, a class of beneficiaries, the source of
financing, and procedures for receiving benefits." <u>Smith v.</u>
<u>Hartford Insurance Group</u>, 6 F.3d 131, 136 (3d Cir. 1993) citing
<u>Donovan,</u> 688 F.2d at 1373. The Court noted that ERISA does not
provide a definition for the term "plan", but a plan does not
have to be reduced to a writing in order for it to be
enforceable. 6 F.3d at 136, citing <u>Deibler</u>, 973 F.2d at 209.
However, the Court noted that an act which recorded a decision to
provide benefits can be direct or circumstantial evidence of the
existence of a plan, but such acts are not the plan itself. <u>Id</u>.
citing <u>Donovan,</u> 688 F.2d at 1373.

The Court of Appeals applied the <u>Donovan</u> test in <u>Smith v.</u>
<u>Hartford Insurance Group</u> to find that an informal plan did not
exist. 6 F.3d 131.  In <u>Smith</u>, the Court stated that the employees
did not sign a document like that signed in <u>Donovan</u> which
indicated that they subscribed to a trust financed by the
employer. <u>Id</u>. at 136. Further, the Court noted that the alleged
plan document referred to another pre-existing plan. <u>Id</u>.
Therefore, the Court determined that the document was not an
employee benefit plan.

Under the test articulated in Donovan, the APA could be generally construed to be a plan. A reasonable person could conclude that under the APA, the intended benefits are those provided by the Westinghouse Plan, the class of beneficiaries are the employees who would transfer to Siemens in connection with the sale, the source of financing is split between the employers, and procedures for receiving benefits are the same as those within the Westinghouse Plan with modification provided in the APA. See Donovan, 688 F.2d at 1373. However, the APA does not qualify as a plan document. First, as in Smith, the APA refers to another plan, the Westinghouse Plan. Second, the APA is best characterized as an act which extended benefits, and thus is evidence of a plan but not the plan itself. See Donovan, 688 F.2d at 1373. Finally, the APA is a document between the employers, not signed by or relied upon by the employees. See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees, 974 F.2d 391, 400 (3d Cir. 1992). The Court of Appeals commented in Henglein that in order to determine whether an informal plan exists, the "district court should first determine what written representations were made by a putative sponsor to its employees over the course of their employment." 974 F.2d 391, 400 (3d Cir. 1992). In this case, the APA can not be characterized as a written representation made by a sponsor to its employees because it was a contract between the employers.  Further, the Plan specifically provides that there are no third party beneficiaries

21

to the agreement. (Doc. #57, ex 1 at 99).

Although the APA is not a plan document, the APA clearly is an "act... that record[ed] a decision to extend certain benefits. Although <u>Donovan</u> stated such acts can be direct or circumstantial evidence of a plan, they are not in themselves a plan." <u>Smith</u>, 6 F.3d at 136. Therefore, if the APA is more properly construed as evidence of a plan rather than the plan itself, the question remains what plan was in existence between August 19, 1998 and September 1, 1998, when admittedly the Siemens (written) Plans were not yet effective. Because the APA can be direct or circumstantial evidence of a plan, the clear reference to the Westinghouse Plan in the APA suggests that the Westinghouse Plan was the Plan which provided Siemens employees with coverage after the asset sale had occurred, but before the Siemens Plans were made effective on September 1, 1998. (See Doc. 57, ex 1D at 14.) The parties agree that Siemens Employees were covered under the Westinghouse Plan.  (See Doc. 56 at ¶¶ 4-8.)

As previously noted, under the APA, the intended benefits were those provided by the Westinghouse Plan, the class of beneficiaries were the employees who would transfer to Siemens in connection with the sale, the source of financing was split between the employers, and procedures for receiving benefits were the same as those within the Westinghouse Plan, with some modification as provided in the APA. See <u>Donovan,</u> 688 F.2d at 1373. On August 19, 1998 when the employees were transferred to

Siemens, an amendment to the APA provided that the Westinghouse Plan would be amended to give the transferred employees credit for service for the period through August 31, 1998. (See Doc. 57, ex 1D at 14.) That document, amendment number 4 to the APA provided that if an employee was terminated other than for cause before September 1, 1998, Siemens would reimburse Westinghouse for any pension loss. (Id at 14.) Otherwise, Westinghouse remained liable for benefits accrued until the closing date for pension purposes. (Id.) Specifically, the Amendment number 4 provided that a new Section 5.5(r) would be added which would provide that:

> (i) Sellers shall cause the [Westinghouse] ... Pension Plan ... to be amended to provide credit for service and compensation imputed or paid to Business Employees for the period through August 31, 1998, notwithstanding that such Business Employees will be employees of Purchaser from and after the Closing Date[8]...
> (ii) Purchaser covenants not to cause the termination of employment of any Business Employee other than for cause before September 1, 1998 and in the event that it does, to reimburse Sellers for any actuarial pension loss caused by such termination.

(Id.) The language of Amendment Number 4 reveals that Siemens and Westinghouse contracted to change the terms of the Westinghouse Plan to provide Siemens employees with coverage under the

---

[8] Closing Date for pension purposes was September 1, 1998, but that date was limited in application to Sections 5.5(d),(e) and (h). (See Doc. 57, ex 1D at 12.)  Therefore, this "closing date" was the sale closing date of August 19, 1998, which was the date the employees were transferred to Siemens. (See Doc. 56 at ¶4.)

Westinghouse Plan from August 19 to August 31, 1998. Therefore, Siemens provided its new employees with pension benefits through the Westinghouse Plan until its Plans were effective. This creation of a transition plan is evidenced by the terms of the APA and amendments thereto. As such, the Westinghouse Plan covered both Westinghouse and Siemens employees from August 19, 1998 to September 1, 1998 by contractual agreement between the parties. Hence, this temporary arrangement is a transition plan which must be evaluated under Plaintiffs' Section 204(g) claim.

### (ii). Plan Amendment Issue

When an employee claims a violation of Section 204(g), the inquiry begins with determining whether the plan has been amended. See <u>Hein v. Federal Deposit Insurance Corporation</u>, 88 F.3d 210, 216 (3d Cir. 1996). The phrase "by an amendment of the plan" could be construed to regulate more than just a change in the express terms of the plan, and thus the phrase is ambiguous. The term "amendment" has not been defined by ERISA, and therefore what qualifies as a plan amendment turns on statutory interpretation.  See 29 U.S.C. § 1002. The United States Supreme Court directs that:

> As in all statutory construction cases, we begin with
> the language of the statute. The first step is to
> determine whether the language at issue has a plain and
> unambiguous meaning with regard to the particular
> dispute in the case. The inquiry ceases if the
> statutory language is unambiguous and the statutory

scheme is coherent and consistent.

Barnhart v. Sigmon Coal Co., Inc., 122 S.Ct. 941, 950 (2002).

In Central Laborers Pension Fund v. Heinz the Supreme Court of the United States explained ERISA's complex statutory structure:

> When Title I of ERISA was enacted to impose substantive legal requirements on employee pension plans (including the anti-cutback rule), Title II of ERISA amended the Internal Revenue Code to condition the eligibility of pension plans for preferential tax treatment on compliance with many of the Title I requirements. The result was a 'curious duplicate structure' with nearly verbatim replication in the Internal Revenue Code of whole sections of text from Title I of ERISA. The anti-cutback rule of ERISA § 204(g) is one such section, showing up in substantially identical form as 26 U.S.C. §411(d)(6). ... Although the pertinent regulations refer only to the Internal Revenue Code version of the anti-cutback rule, they apply with equal force to ERISA § 204(g)... ("The regulations under section 411 are also applicable to provisions of [ERISA] Title I.")

Heinz, 541 U.S. at 746-47 (internal citations omitted), See also 26 CFR § 1.411(a)-1 et seq which corresponds with the IRC provisions. The Treasury Regulations describe a plan amendment as "any changes to the terms of a plan, including changes resulting from a merger, consolidation or transfer (as defined in Section 414(l)) or plan termination." 26 C.F.R. 1.411(d)-(3)(a)(1). Section 414(l) defines a transfer as "diminution of assets or liabilities with respect to one plan and the acquisition of these assets or the assumption of these liabilities by another plan. For example, the shifting of assets or liabilities pursuant to a reciprocity agreement between two plans... ." 26 C.F.R. §

25

1.411(l)(3).

Based upon the Treasury Regulations' definition of a plan
amendment, the adoption of the Siemens Plans was a plan
amendment. The APA included a reciprocity agreement which shifted
the liabilities for benefits between the parties. Thus, the APA
is evidence that any changes resulted from a transfer. 26 C.F.R.
§ 1.411(l)(3). Further, the Treasury Regulations recognize <u>any
changes</u> to the terms of a plan as an amendment of the plan.

The term 'amendment' clearly embraces the facts of this
case. It is undisputed that Siemens hired the Plaintiffs on
August 19, 1998; Plaintiffs received benefits from the
Westinghouse Plan until August 31, 1998; and the Siemens Plans
were adopted on October 29, 1998 but the plan documents were made
effective on September 1, 1998. (Doc. #56 ¶¶4-8.) The parties to
the APA contracted to use September 1, 1998 as the closing date
for pension purposes. (See Doc. 57, ex 1D at 12.) Therefore, this
date is the measuring date for determining whether the Siemens
Plans were 'substantially identical' to the Westinghouse Plan to
fulfill its contractual obligation to offer substantially
identical benefits to the transferred employees under the APA.

In the fourth amendment to the APA, Westinghouse agreed to
pay the transferred employees benefits accrued through August 31,
1998 and Siemens agreed not to terminate any of its new employees
during this transition time. (See Doc. 57, ex 1D at 14.) Pursuant
to this agreement, Siemens employed Plaintiffs on August 19,

26

1998, and those Plaintiffs had accrued PJS benefits, albeit from the Westinghouse Plan, until August 31, 1998. Id. On September 1, 1998, the Siemens Plans became effective, and the Siemens Plans did not offer PJS benefits. Therefore, the newly hired employees' benefits were reduced. The PJS benefits were provided to Siemens employees under an arrangement with the Westinghouse Plan. The benefits which were cut back by Siemens were accrued benefits, which were protected under Section 204(g) by Bellas. Section 204 prohibits a decrease in benefits by plan amendment. The 'plan amendment' was the adoption of the written Siemens Plans on September 1, 1998.[9]

Further, the Supreme Court of the United States has interpreted the cutback statute in a similar manner. It evaluated a plan amendment in its 'practical sense' when it noted that "[t]here is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them" and then it rejected technical arguments made to justify a plan cutback. Heinz, 541

---

[9] Oral amendments and informal written modifications to employee benefit plans are impermissible under ERISA.  See 29 U.S.C. § 1102(b)(3). A case cited by Defendants, In re Fairchild Industries, Inc., noted aptly that "ERISA prohibits the amendment of an employee benefit plan through informal written documents, or by any other means except as specified in the plan documents themselves pursuant to ERISA... ." 768 F.Supp 1528, 1532 (N.D. Fla. 1990). In contrast, this case involves a formal amendment by adoption of written Plans pursuant to the APA. This formal amendment cut back benefits which were provided in the transition plan created by a contract between employers.

U.S. at 743. The Court's focus on the practical impact of an amendment and the purpose of ERISA when determining whether a cutback had occurred is instructive. Further, this "substance over form" approach in the illegal cutback context has been utilized by the Court of Appeals for the Third Circuit. The Court has noted that in an ERISA cutback claim, "the critical question is whether [Defendants'] interpretation of the Plan improperly denied accrued benefits to [Plaintiffs]." Hien, 88 F.3d at 216-17. The Court added that "[t]his determination does not end our inquiry, however. An erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an amendment for the purposes of ERISA § 204(g)." Id. at 216.

In this case, Siemens did not interpret provisions of *its written Plans* to deny benefits, but adopted the sunset clause into its transition plan, by allowing Siemens employees to receive benefits under the Westinghouse Plan which contained the sunset clause. Further, Siemens interpreted the sunset provision in the Westinghouse Plan to authorize it to not include the PJS benefits in its plan in order to meet its contractual obligation to provide terms and conditions "substantially identical" to those in the Westinghouse Plan. Two reported cases present similar facts which support the Court's interpretation of this transaction as a plan cutback: Hunger v. AB, et al, 12 F.3d 118

(8th Cir. 1993); and <u>Gillis v. Hoechst Celanese Corporation</u>, 4 F.3d 1137 (3d Cir. 1993).

The U case, decided by the Court of Appeals for the Eighth Circuit,[10] involved employees who sought benefits from their successor employer under a Section 204(g) claim, although the successor employer did not assume either assets or liabilities of the predecessor's plan. <u>Hunger v. AB, et al</u>, 12 F.3d 118, 199 (8th Cir. 1993). The <u>Hunger</u> Court determined that the "but for" test was appropriate to measure whether an amendment reduced or eliminated benefits. 12 F.3d at 120. In <u>Hunger</u>, the Court found after applying the "but for" test that the amendment did not offer less benefits than the predecessor's plan. <u>Id.</u>  The "but for" test required an analysis of whether the benefit was available under the plan prior to the amendment by comparing the pre-amendment conditions to the benefit as provided under the plan. <u>Id.</u> at 121.

The "but for" test utilized by the <u>Hunger</u> Court, applied to

---

[10] <u>Hunger</u> was referenced by the Court of Appeals for the Third Circuit in <u>Dade v. North American Phillips Corporation</u> as being consistent with its holding on almost identical facts. See <u>Dade</u>, 68 F.3d 1558, 1564 (3d Cir. 1995). The analysis of the Court in <u>Dade</u> is not helpful in determining the case at bar. In <u>Dade</u> the Court determined that due to the specific language of the pension plan at issue, a predecessor employer was not required under ERISA 204(g) to count service with a successor employer towards benefits under its plan. 68 F.3d at 1562. <u>Dade</u> is distinguishable from the instant case because the Court found that no amendment or interpretation of the plan could be construed to have reduced benefits, the specific terms of the predecessor plan denied benefits, and recovery of benefits was directed to the predecessor plan. 68 F.3d at 1562.

this case, reveals the elimination of benefits. "But for" the employees coverage under the Siemens Plans, the employees would have been entitled to PJS benefits on September 1, 1998 because <u>Bellas</u> determined that the amendment was an illegal cutback. Therefore, "but for" Siemens' interpretation of the amendment, the employees would be covered by the <u>Bellas</u> decision and thus entitled to benefits.

The <u>Hunger</u> Court distinguished its facts from a case that was decided in the Third Circuit which utilized a "separation from service analysis" in determining the timing of when pre-amendment conditions had been met. See <u>Gillis v. Hoechst Celanese Corporation</u>, 4 F.3d 1137 (3d Cir. 1993). <u>Hunger</u> recognized that in <u>Gillis</u>, the sale was made pursuant to an agreement that the purchaser would provide substantially the same benefits as those the Seller had provided, and "[t]hus, the employee/plaintiffs were subsequently employed by the plan sponsor that had assumed both the obligations and assets of the retirement plan." <u>Hunger</u>, 12 F.3d at 121-22.

This contractual obligation to provide substantially similar benefits in <u>Gillis</u> is similar to the instant case.[11] Plaintiffs

---

[11] Notably, <u>Gillis</u> involved a plan merger, where in this case the parties have stipulated that no relevant transfer of plan assets occurred.  However, this fact does not appear to be central to the "separation from service" analysis provided by the <u>Gillis</u> Court. See <u>Gillis,</u> 4 F.2d at 1146-47. Further, the above analysis  suggests there was a transfer of liabilities under the APA, and thus 208 is applicable.

were transferred to Siemens following a corporate asset transfer, and were employed in the same job at the same desk for a new owner. See Gillis, 4 F.3d at 1146-47. Therefore, the transferred employees were not separated from service when they began working for Siemens. See Gillis, 4 F.3d at 1147. The Gillis Court held that under the IRS rulings, statutes, and legislative history, and applicable Treasury Regulations, employees who were not separated from service could continue to accumulate years of service under the predecessor's plan while working for a successor employer. Id. at 1147. Specifically, the Gillis Court noted that "protected benefits may not be eliminated by reason of transfer or any transaction amending or having the effect of amending a plan or plans to transfer benefits." Id. citing 26 C.F.R. 1.411(d)-4 (Q&A 3)(1992). This broad prohibition embraces the situation in the current case: a transaction having the effect of amending a plan.

These two cases provide a framework to evaluate this case. Under the Hunger Court's "but for" test, "but for" Siemens elimination of benefits by interpretation of the amendment, the employees would be entitled to PJS benefits under the Bellas decision. Hunger, 12 F.3d at 120. Finally, as noted in Gillis, the "protected benefits may not be eliminated by reason of transfer or any transaction amending or having the effect of amending a plan or plans to transfer benefits." See Gillis, 4 F.3d at 1147 citing 26 C.F.R. 1.411(d)-4 (Q&A 3).

31

Therefore, the Siemens Plans were a continuation of the terms of the Westinghouse Plan, demonstrated by the transfer of employees without a break in service; there was a transfer of liabilities; and there was a contractual obligation to offer substantially identical benefits to the transferring employees. This transaction implicates ERISA because the Siemens Plans did not continue the PJS benefits that the Siemens employees had under the terms of the Westinghouse Plan. This was a plan amendment which denied Plaintiffs protected accrued PJS benefits, independent of any requirement under Section 208 to provide equal or greater benefits.

Therefore, Siemens' Plan was an amendment of the Westinghouse Plan in violation of Section 204(g).

**(iii). Satisfaction of pre-amendment conditions**

Based upon the previous discussion, Defendants violated ERISA Section 204(g) by cutting back the early retirement benefit portion of the PJS benefits.  However, a portion of the PJS benefits were found to be retirement type subsidies by <u>Bellas</u>. See <u>Bellas v. CBS, Inc.,</u> 221 F.3d at 538. Thus, Plaintiffs, must establish that they satisfied preamendment conditions to qualify for the PJS benefits in order to establish that the early retirement type subsidy portion of the PJS benefits was illegally cut back. See 29 U.S.C. 1054(g)(1)(B).

32

Defendants argue at length that the express terms of the Westinghouse Plan provide that PJS benefits are not to be paid by successor employers and that employees who transfer to successor employers are not eligible for these benefits. (Doc. 55, ex 1 at 13-14.) Defendants reliance on Gritzer v. CBS Inc., to support its argument is misplaced. See 275 F.3d 291 (3d Cir. 2002). In Gritzer, the Court of Appeals for the Third Circuit found in favor of an employer who did not provide benefits following a transfer of employees to a successor employer based upon the language of the seller's plan document. Gritzer, 275 F.3d 291 (3d Cir. 2002). The Gritzer Court determined that a Permanent Job Separation required termination by an employer and the successor employer did not meet the Plan's definition of "employer." Id. at 294-95. Therefore, the Court determined that employees were not entitled to benefits. Id. at 298. Gritzer is distinguishable in that in that case the predecessor employer was being sued and it was its plan document that was being analyzed. The Gritzer Court noted that the Court was not asked to determine whether the Reciprocal Service Agreement between the companies extended the benefits to the employees contractually. Id. at 298.

In this case, the APA extends the PJS benefits by contractual agreement. Finally, the Court of Appeals for the Third Circuit in Gillis held that satisfaction of pre-amendment conditions does not have to occur until separation from service. Gillis, 4 F.3d at 1146. Thus, as in Gillis, no separation from

33

service occurred until Siemens terminated the transferred employees, thereby implicating the terms of the PJS benefits contained within its Plans.

Plaintiffs assert that they have satisfied all preamendment conditions for the PJS, including the age and service requirements. Defendants have not identified any preamendment conditions they claim Plaintiffs have not satisfied. Thus, it is not necessary for the Court to determine whether Plaintiffs have satisfied the preamendment conditions.

### c. Conclusion

This case presents a complex issue of first impression which turns on statutory interpretation and analysis of the APA. For the reasons given above, it is recommended that Plaintiffs' motion for summary judgment be granted.

### 2. Defendants' Motion for Summary Judgment

Defendants raise two defenses to Plaintiffs' claims which are independent of the statutory interpretation issues discussed in connection with Plaintiffs' claims. Defendants assert that Plaintiffs cannot recover benefits under ERISA Section 502(a)(1)(B) because that section authorizes the recovery of benefits due under the Plan and the Siemens Plans do not provide PJS benefits.  Further, Defendants assert that most of the

34

Plaintiffs signed waivers which prevent them from pursuing their claims.

### a. Damage claim under 29 U.S.C. 1132(a)(3)

Defendants claim that Plaintiffs are not entitled to receive the PJS benefits under ERISA Section 502 (a)(1)(b), codified at 29 U.S.C. 1132(a)(1)(b) because that is a civil enforcement provision which only allows Plaintiffs to recover benefits due under the terms of the Plan. (Doc. #55, ex. 1 at 30.) Defendants argue that because Plaintiffs assert that the PJS benefits were required under ERISA, although the parties acknowledge that the benefits were not included under the terms of the Siemens Plans, the Plaintiffs cannot recover benefits under the terms of the Siemens Plans. (Id.) Defendants argue that the Plaintiffs are limited to equitable relief under ERISA Section 502 (a)(3), codified at 29 U.S.C. 1132(a)(3).

Plaintiffs argue that they can properly request benefits under Section 502 (a)(1)(b) as money damages or as equitable restitution under 502(a)(3), codified at 29 U.S.C. 1132(a)(3). (Doc. # 62 at 17-21.) They note that the court can alternatively remedy the violation through injunctive relief. (Id. at 20.)

Specifically, the portions of Section 502 at issue provide that:

**(a) Persons empowered to bring a civil action**
A civil action may be brought--

35

          (1) by a participant or beneficiary--
                         ...
          (B) to recover benefits due to him under the terms of
          his plan, to enforce his rights under the terms of the
          plan, or to clarify his rights to future benefits under
          the terms of the plan;
                         ...
          (3) by a participant, beneficiary, or fiduciary (A) to
          enjoin any act or practice which violates any provision
          of this subchapter or the terms of the plan, or (B) to
          obtain other appropriate equitable relief (i) to
          redress such violations or (ii) to enforce any
          provisions of this subchapter or the terms of the
          plan...

29 U.S.C. 1132(a)(1)-(3). It is not contested that Plaintiffs

were plan participants. They seek to recover benefits due under

the terms of the Plans. The above analysis of Plaintiffs' motion

for Summary Judgment concludes that Siemens Plans violated

Section 204(g) of ERISA by amending the Westinghouse Plan to

eliminate PJS benefits. Therefore, Plaintiffs may be able to

recover PJS benefits under ERISA Section 502 (a)(1)(B).


     **b. Waiver of Claims by Release**

     The parties agree that two hundred of the two hundred and

thirty class members signed releases which are "substantially in

the form of exhibits 51 through 59" and "while the Releases

differed slightly, each Release contained substantially identical

language regarding the release and promise not to sue." (Doc. #56

at ¶¶ 29-30.)

     Defendants assert that the claims of the class members who

signed releases are barred by the releases. (Doc. #55, ex 1 at 32-34.) Plaintiffs respond by arguing that a benefit protected under ERISA can not be waived, that the releases did not specifically waive PJS benefits, and that a waiver would violate the Older Workers' Benefit Protection Act. (Doc. #62 at 21-26.) Defendants reply that the Older Workers Benefit Protection Act does not apply to ERISA claims, and that a voluntary waiver is a valid bar to ERISA claims. (Doc #65 at 14-17.)

Plaintiffs claim that ERISA benefits can not be waived under 29 U.S.C. 1056(d)(1), which provides that "benefits provided under the plan may not be assigned or alienated." See 29 U.S.C. 1056(d)(1).[12] The Court of Appeals has stated that as a general matter, a "waiver is not the same thing as assignment or alienation. Assignment or alienation involves an affirmative transfer of benefits to another person, whereas waiver usually involves only a refusal of benefits on the part of the individual slated to receive them." McGowan v. NJR Service Corp., 423 F.3d 241, 248 (3d Cir. 2005). In McGowan, the Court held that although "ERISA does not expressly state that waivers are prohibited, recognition of the waiver sought in this case would undermine Section 1056(d)(1)" because the participant sought to

---

[12] Plaintiffs also cite 26 CFR 1.411(d)(4)Q&A-3(3) as support for this assertion. This Section deals with the transfer of benefits among plans, not whether participants can waive rights to pursue a cause of action under ERISA as a part of a severance package.

utilize a waiver to "effectuate what is the functional equivalent of an assignment of benefits." Id. at 249. However, Defendants seek to utilize the waivers in this case to defeat claims by Plaintiffs who signed them, not to defeat assignments of benefits.  Thus, the holding in McGowan is distinguishable and does not provide a basis for invalidating the waivers.

Further, Plaintiffs' citation to the Older Workers Benefit Protection Act (OWBPA) is does not help them because the Act specifically applies to Age in Discrimination in Employment Act (ADEA) claims, but does not appear to have been applied to ERISA claims. See Long v. Sears Roebuck & Co.,105 F.3d 1529, 1544-45 (3d. Cir. 1997) and Age in Discrimination in Employment Act of 1967, § 2 et seq., codified at 29 U.S.C. §621. Congress intended to supercede common law in the area of ADEA releases when it enacted the OWBPA as an amendment to ADEA. See Long, 105 F.3d at 1539. Plaintiffs have not cited any authority for extending the statutory requirements for releases in the ADEA context to ERISA claims. Therefore, Plaintiffs have failed to establish that ERISA benefits can not be waived by execution of a release.

Plaintiffs assert that the releases "are at best ambiguous as to whether they waive pension or the PJS" and thus the parties' intent is controlling. (Doc. #62 at 21). When a release affects rights protected by federal law, such as ERISA, the release is subject to interpretation under federal common law. See Pilot Life Ins. Co. V. Dedeaux, 107 S.Ct 1549, 1557 (1987).

38

The Court of Appeals for the Third Circuit has addressed the requirements for a valid waiver of an employment claim under ERISA and related statutes.  In Cuchara, the Court held that the plaintiff had waived potential claims under ERISA and other statutes and said:

> Employees may waive employment claims against their employers so long as the waiver is made "knowingly and willfully." To determine whether such a purported release is valid, we use a totality of the circumstances test. Among the factors we consider are: (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received the benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law. We may also consider 'whether there is evidence of fraud or undue influence, or whether enforcement of the agreement would be against the public interest.'

Cuchara v. Gai-Tronics Corp.,129 Fed.Appx. 728, 730-31 (3d Cir. 2005)(unreported) (internal citations omitted), citing Coventry v. United States Steel Corp., 856 F.2d 514, 522 (3d Cir. 1988)(quotation omitted); Alexander v. Gardner-Denver Co., 94 S.Ct. 1011 (1974); Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir. 1988); and W.B. v. Matula, 67 F.3d 484, 497 (3d Cir. 1995).

Defendants raised the releases as an affirmative defense, and therefore have the initial burden of proof. See Fed.R.Civ.P.

8(c), and <u>Long v. Sears Roebuck & Co.</u>, 105 F.3d 1529,1543 (3d Cir. 1997). They have satisfied that burden by producing the releases. The burden is shifted to Plaintiffs to establish that the releases are not valid. See <u>Wicker v. Consolidated Rail Corporation</u>, 142 F.3d 690, 696 (3d Cir. 1998). In the ERISA context, the validity of the release is based upon the totality of the circumstances which demonstrate that a release was "knowing and voluntary". See <u>Laurenzano v. Blue Cross Blue Shield</u>, 191 F.Supp.2d 223, 227 (2002). The Court of Appeals for the Third Circuit has not expressly addressed the burden of proof. "Absent some reason to believe that Congress intended otherwise, therefore, we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief." <u>Schaffer ex rel. Schaffer v. Weast</u>, 126 S.Ct. 528, 535 (2005).  Thus, the burden of proof is on the party challenging the validity of the release, Plaintiffs here.  Further, the factors addressed in <u>Cuchera</u> are most easily addressed by the party challenging the release it executed.

The only evidence Plaintiffs have produced to challenge the validity of the releases consists of nine sample releases and the names of the individuals who signed them.  The totality of the circumstances test evaluates "the clarity and specificity of the release language," but also evaluates:

> the plaintiff's education and business experience; ...
> the amount of time plaintiff had for deliberation about
> the release before signing it; ... whether plaintiff

40

> knew or should have known his rights upon execution of
> the release; ... whether plaintiff was encouraged to
> seek, or in fact received the benefit of counsel; ...
> whether there was an opportunity for negotiation of the
> terms of the Agreement; and ... whether the
> consideration given in exchange for the waiver and
> accepted by the employee exceeds the benefits to which
> the employee was already entitled by contract or law.

See Conventry, 856 F.2d at 523. Plaintiffs have not addressed any of these factors other than by producing a list of names of the class members who signed releases, and the nine sample releases. Thus, Plaintiffs have not shown the releases to be invalid under the totality of the circumstances test.

Plaintiffs assert that the failure of the releases to include the term "PJS" or "pension benefit" makes them ambiguous. Each sample release will be evaluated for ambiguity.

The most comprehensive release which has been produced was filed in the Middle District of North Carolina, and is described as a "Settlement Agreement Full and Final Release Of All Claims." (Doc. #59). It acknowledges that the named three plaintiffs instituted legal claims which are pending in federal court, and that the parties mutually agreed to resolve "any and all disputes that may now exist between them."  (Doc. #59, ex 51 at sw 16281.) The release releases any and all claims, including those raised under ERISA. (Id. at sw 16282-83.) However, the release also provides that it will not "affect any health care or pension benefits provided by Westinghouse Electric Corporation or CBS Corporation to which Plaintiffs may be entitled." (Id. at sw

41

16283.) Finally, the plaintiffs acknowledge that they consulted an attorney about the meaning and intent of the settlement agreement and that they entered into the agreement voluntarily with the intent to be legally bound to its terms. (Id. at sw 16287.) The plain meaning of the terms of this agreement demonstrate that the right to pension benefits was expressly reserved, but this reservation was as to claims against Westinghouse Electric Corporation, not Siemens. Therefore, on the face of this release it unambiguously waived all ERISA claims against Siemens.

Some, but not all, of the sample agreements specifically release, inter alia, all claims arising under ERISA, and therefore they are not ambiguous. See Coventry v. United States Steel Corp., 856 F.2d 514, 522 (3d Cir.1988) (clarity and specificity of the release language is evaluated to determine whether the release was made knowingly and voluntarily). The sample release at exhibit 51 used general language that released any an all claims arising at any time until the release was executed, and included ERISA claims.  (Doc. #59 ex. 51 at sw 16282-83.) The complaint in this action was filed on May 31, 2001 and the release was executed in August 2002. The sample releases at exhibits 52 and 53 used similar general language and specifically released claims pursuant to ERISA. (Doc. #59 exs. 52 at sw 11419, 53 at sw 11432). Thus, these releases are unambiguous and the class members who signed these releases

42

waived their rights to pursue ERISA claims.

The sample releases at exhibits 54 through 59 do not expressly waive ERISA claims. (Doc. #59, ex. 54-59.) However, all of these sample releases contain language which releases all claims arising out of employment or termination of that employment. (Doc. #59, exs. 54 at sw 11443, 55 at sw 11465, 56 at sw 11454, 57 at sw 11474, 58 at sw 11166 and 59 at sw 11182.) Further, these sample releases are in the form of separation agreements which provide substantial consideration in exchange for the release of liability. (See Id.) There is nothing in the language of these releases which preserves the right to file suit for PJS benefits. The clear force of the release was to any and all claims arising out of employment and termination of employment. Thus, these releases are unambiguous and the class members who signed them waived their rights to pursue an ERISA claim.

Therefore, it is recommended that Defendants' Motion for Summary Judgment be granted as to each of the class members who signed a release.

III. <u>CONCLUSION</u>

For the foregoing reasons, it is recommended that Defendants' Motion for Summary Judgment be granted as to the class members who signed a release. It is further recommended

43

that Plaintiffs' Cross Motion for Summary Judgment be granted as to each of the class members who did not sign a release.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


                                        /s/ Ila Jeanne Sensenich
                                        ILA JEANNE SENSENICH
                                        United States Magistrate Judge


Dated:    December 13, 2005

cc:   The Honorable David S. Cercone
      United States District Judge

      Theodore Goldberg, Esquire
      David Rodes, Esquire
      Goldberg, Persky, Jennings & White, P.C.
      1030 Fifth Avenue, Third Floor
      Pittsburgh, PA 15219

      William T. Payne, Esquire
      1007 Mt. Royal Boulevard
      Pittsburgh, PA 15223

      Frederick W. Bode, III, Esquire
      Maria Greco Danaher, Esquire
      Dickey, McCamey & Chilcote, P.C.
      Two PPG Place, Suite 400

                                44

Pittsburgh, PA 15222-5402

Dana L. Rust, Esquire
David F. Dabbs, Esquire
McGuire Woods, LLP
One James Center
901 East Cary Street
Richmond, VA 23219