**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**RONALD SHAVER, WILLIAM J.**          )
**WHITNEY, JOE FEDELE, RALPH**         )
**RIBERICH** and **ANTHONY P. KANZ,**   )
on behalf of themselves and others     )          **2:02cv1424**
similarly situated,                    )          **Electronic Filing**
                                       )
          Plaintiffs,                  )          Judge David S. Cercone
                                       )          Magistrate Judge Sensenich
     vs.                               )
                                       )
**SIEMENS CORPORATION**, and            )
**SIEMENS WESTINGHOUSE**                )
**RETIREMENT PLAN FOR UNION**           )
**EMPLOYEES,** and **SIEMENS**           )
**WESTINGHOUSE RETIREMENT**             )
**PLAN,**                               )
                                       )
          Defendants.                  )

# 🎵 MEMORANDUM ORDER

AND NOW, this **29** day of March, 2007, upon due consideration of the parties' cross

motions for summary judgment and their submissions in conjunction therewith, IT IS

ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. No. [60]) be, and the same

hereby is, granted as to defendants' liability for those class members who did not sign a release,

and denied as to the class members who did sign a release; and

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. No.

[53]) be, and hereby is, denied. The Report and Recommendation of Magistrate Judge

Sensenich, dated December 13, 2005 (Doc. No. [76]), as augmented and modified herein, is

adopted as the opinion of the Court.

On August 16, 2002, this case was referred to United States Magistrate Judge Ila Jeanne

Sensenich for pretrial proceedings in accordance with the Magistrates Act, 28 U.S.C. §§

636(b)(1)(A) and (B), and Rules 72.1.3 and 72.1.4 of the Local Rules for Magistrates. The

Magistrate Judge's Report and Recommendation recommended Defendants' Motion for

Summary Judgment be granted as to the class members who signed a release and Plaintiffs'

Cross Motion for Summary Judgment be granted as to the class members who did not sign a release. Both parties filed objections to the Report and Recommendation and responses to the other parties' objections, as well as other supplemental submissions. After *de novo* review of the pleadings and documents in the case, together with the Report and Recommendation, and the parties' submissions in conjunction therewith, the court concludes that in the absence of an effective waiver, plaintiffs have been denied accrued Permanent Job Separation ("PJS") pension benefits which were available to them for the thirteen day period in which Siemens committed itself in the Asset Purchase Agreement ("APA") to provide transitional coverage for them, and as a result the Siemens Plans that became effective on September 1, 1998, constituted an amendment of an ERISA plan that eliminated accrued pension benefits in violation of the anti-cutback prohibition reflected in § 204(g) and the corresponding Treasury Regulations. Accordingly, plaintiffs are entitled to summary judgment for each member who did not sign a release.

Defendants' objections are unavailing. The contention that the APA did not transfer liabilities between the Plans is undermined sufficiently by careful and comprehensive consideration of all the relevant provisions of the APA. The contracting parties' expressed commitment to obligate Siemens Corporation ("Siemens") to provide benefits equal to those available in the Westinghouse Plan forcefully suggests that they understood the transaction to constitute a transfer within Section 208's ambit and its corresponding regulations, notwithstanding the manner in which the accrued liability at purchase was being funded/satisfied. Furthermore, as aptly explained by the magistrate judge, Siemens became "responsible" for all specific post-closing benefits that were not captured within the retained liability of the Westinghouse Plan for transferred employees' "accrued benefit calculation as of the Closing Date." Through this arrangement the future liabilities of the Westinghouse Plan were reduced. Siemens' Plans assumed this liability and thus there was a diminution of Westinghouse Plan liabilities and an assumption of those liabilities by Siemens' Plans. The fact that the

2

Westinghouse Plan retained all liability for actual accrued pension benefits calculated through August 31, 1998, does not change this basic aspect of the contractual commitments reflected in the APA.

Defendants' contention that the magistrate judge erroneously concluded that the APA transferred pension liabilities from the Westinghouse Plan to the Siemens Plans is misplaced. The magistrate judge clearly recognized the issue is whether the parties to the APA committed themselves to carry out transactions that fell within the ambit of Section 208. The record conclusively demonstrates that they did. Furthermore, Defendants' position that any implications ERISA had on the APA simply were avoided because the contracting parties did not include the seller's existing and buyer's post-created ERISA plans is insidious. Section 208 is not limited to transactions between plans. To the contrary, Section 208 regulates the actions of employers when they commit themselves to act as plan sponsors or settlors of existing or future ERISA trusts. See Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1147 (3d Cir. 1993) (an employer may transfer liability for early retirement benefits to another employer, to whom it has sold a division of its operations, but in doing so it must comply with Section 208 and transfer sufficient assets to fund those benefits), cert. denied, 511 U.S. 1004 (1994); Koch Industries v. Sun Co., 918 F.2d 1203, 1207 (5th Cir 1990) (Section 208 imposes two separate duties on employers when they merge, consolidate or transfer liabilities of pension plans: (1) they may not decrease the liabilities of the plan; and (2) they must "transfer sufficient plan 'assets' to pay previously promised benefits to employees as they come due"); Bigger v. American Commercial Lines, 862 F.2d 1341, 1345 (8th Cir. 1988) (Section 208 imposes on employers acting as plan sponsors of defined benefit plans the obligation to transfer sufficient assets to provide for the benefits accrued on the date of spin-off); Systems Council EM-3, International Brotherhood of Electrical Workers, AFL - CIO v. AT& T Corp., 972 F. Supp. 21, 32-33 (D. D.C. 1997) (Section 208 governs the transfer of assets between single employer plans and imposes certain minimal requirements on the employer as plan sponsor). Any ruling to the contrary clearly would render the basic protections

3

contained therein illusory.

Defendants' argument that the intent of the parties to the APA has been improperly ignored also is misplaced. The rules of contract construction are well settled and it is beyond question that the provisions of a contract are to be read together as a harmonious whole. Kemmerer v. ICA Americas, Inc., 70 F.3d 281, 288 (3d Cir. 1995); Kinek v. Paramount Communications, 22 F.3d 503, 509 (2d Cir. 1994). And where the various provisions of the instrument are clear and unambiguous, the instrument will be interpreted as a matter of law according to its plain meaning. Kemmerer, 70 F.3d at 289. The intent of the parties becomes a factual issue only where the language in question creates two reasonable interpretations and thus a material ambiguity exists. Kinek, 22 F.3d at 509 ("Extrinsic evidence regarding the parties' intent is relevant, however, only if the contract is ambiguous."); Mellon Bank N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980) (extrinsic evidence is relevant where the parties have offered two separate reasonable interpretations to a contract or one or more of its provisions); Alexander v. Primerica Holdings, Inc., 967 F.2d 90, 95 n.1 (3d Cir. 1992) (remanding with directions to apply principles governing contract ambiguity to ERISA plan and an amendment thereto).

Here, the court's inquiry with regard to Section 208 was merely to determine whether the terms of the APA sufficiently implicated Section 208 and thus triggered the floor protections which Congress mandated thereunder and the related ERISA sections and regulations. See Kinek, 22 F.3d at 510 ("It is well established that ERISA provides merely a floor for benefits, not a ceiling."). On this score the terms of the APA as a whole were clear and unequivocal, notwithstanding defendants' purported representation that the contracting parties desired to place their contract beyond the reach of that section in certain respects. Thus, the magistrate correctly noted that the court's inquiry is concerned with whether the transactions effectuated through the APA as interpreted under ERISA require Siemens to provide plaintiffs with PJS benefits, not whether the parties to the APA intentionally sought to avoid shifting that liability to Siemens.

4

Defendants' argument that the APA is being interpreted in a manner that renders the Siemens' Plans unlawful ab initio because they would be underfunded at creation is unavailing. Plaintiffs have not challenged defendants' funding obligations and the court is not called upon to express an opinion on the funding commitments created by the implementation of the APA. Furthermore, there is substantial authority to support plaintiffs' position that PJS benefits were viewed by the IRS as being contingent and unpredictable and therefor beyond the scope of ERISA's defined pension plan funding requirements. See Bellas v. CBS, Inc., 221 F.3d 517, 531 (3d Cir. 2000) ("The IRS believed that this conclusion was consistent with the treatment of shutdown benefits as unpredictable contingent event benefits for purposes of the funding requirements under IRC § 412. See id. at 7855. In determining a defined benefit plan's current liability for purposes of the funding requirements under section 412, unpredictable contingent event benefits are not taken into account until the event on which the benefit is contingent occurs. See IRC § 412( l)(7)(B).").

Furthermore, Siemens' contention that it is being straddled with the unknown and unknowable risk of being "responsible" for the PJS benefits in question is disingenuous. As the magistrate judge aptly observed, Siemens committed itself to provide substantially identical benefits to the transferring employees and defendants unequivocally agreed to accept all future liability that came with that commitment. And as plaintiffs point out, Bellas was preceded by other appellate authority holding that such benefits were protected by ERISA's anti-cutback provision and Siemens Power Corporation Vice President Marc Ungar understood prior to closing that there was a risk that the "very generous" PJS benefits in question could ultimately become Siemens' responsibility in light of the wording and commitments in the APA. Siemens elected not to bring the matter to the main table for an APA amendment. Under these circumstances Siemens cannot claim that the court's ruling creates  unprecedented and un-

5

contemplated "responsibility."[1]

Defendants' objections surrounding the legal implications flowing from Siemens' arrangement to have its new employees remain actively covered under the Westinghouse Plan for thirteen days until the sunset provision in that Plan took affect on August 31, 1998, are for the most part not deserving of extensive discussion. However, defendants' contention that the arrangement between the employers over this thirteen day period fails to constitute an ERISA plan because of the lack of any permanent program being administered by Siemens over this short period of time is not without some appeal. And at least one court has rejected the notion that the thirteen day arrangement changed any aspect of the respective employers' defined benefit plans, thereby implicitly suggesting that no ERISA protections were implicated by the transaction. See McCay v. Siemens Corp., et. al., no: 2:01cv230-VEH. (slip opinion of March 29, 2006 N.D. of AL.) (Doc. No. 88). But after careful consideration we reject the notion that an employer can arrange for its employees to receive benefits under another employer's plans for a set period of time, provide for the administration of those benefits through joint arrangements between the employers, and then disavow that it has any ERISA responsibility for the entire arrangement. At the very least, such an arrangement raises the specter of uncertainty and lack of accountability ERISA was designed to eliminate. More importantly and as accurately highlighted by the magistrate judge, all the prerequisites needed to recognize the existence of an ERISA plan attributable to the actual employer were present and carried out.

The questions of the existence of an ERISA plan is at its base a question of fact. Deibler v. United Food and Commercial Workers' Local Union 23, 973 F.2d 206, 209-10 (3d Cir. 1992). In this regard, "[a]n employer's decision to extend benefits does not constitute, in and of itself,

---

[1]Because defendants have made clear they intend to seek equitable relief on the issue of off-set for severance pay received by plaintiffs at separation, the court expresses no opinion on the "unfair and inequitable" arguments defendants advance in support of their objections at this juncture other than to note that they do not supply a legal basis for rejecting the court's disposition on plaintiff's motion for summary judgment.

the establishment of an ERISA plan." <u>Kulinski v. Medtronic Bio-Medicus, Inc.</u>, 21 F.3d 254, 256 (8th Cir. 1994) (citing <u>Wells v. General Motor Corp.</u>, 881 F.2d 166, 176 (5th Cir. 1989), <u>cert. denied</u>, 495 U.S. 923 (1990)). Instead, "[t]he pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits." <u>Id</u>. at 257. The disbursement of one-time lump-sum benefits pursuant to simple, mechanical determinations do not rise to this level. <u>Id</u>. Pertinent factors relevant to determining whether an ongoing administrative program has been created include: (1) whether the employer's undertakings "could not be fulfilled without ongoing, particularized, administrative "analysis of each case"; (2) whether a reasonable employee would perceive an ongoing commitment by the employer to provide some employee benefits; and (3) whether "the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria." <u>Kosakow v. New Rochelle Radiology Associates</u>, 274 F.3d 706, 737 (2d Cir. 2001) (quoting <u>Bogue v. Ampex Corp.</u>, 976 F.2d 1319, 1323 (9th Cir. 1992), <u>cert. denied</u>, 507 U.S. 1031 (1993), and <u>Schonholz v. Long Island Jewish Med. Ctr.</u>, 87 F.3d 72, 76 (2d Cir. 1996)); <u>accord</u> <u>Pane v. RCA, Corp.</u>, 868 F.2d 631 (3d Cir. 1989) (finding severance plan to be an ERISA plan where employer had to analyze each employee's termination in light of specified criteria).

Here, through the implementation of the APA the intended benefits for Siemens employees were defined, the intended beneficiaries were concretely identified, the source of funding was arranged, and the procedures and administrative services for carrying out the receipt of benefits were identified and allocated between the contracting parties for the benefit of Siemens. And while Siemens contends that the thirteen day period was too short and lacked the permanency for the creation of an ERISA plan, this position conveniently overlooks the permanency of the benefits that accrued to Siemens employees during this time and the fact that Siemens contracted for the administration of those benefits by a third party over their ongoing duration. Furthermore, Siemens did have actual administrative and funding responsibilities in conjunction with Amendment Number 4 to the APA: it agreed to fund any pension loss caused

7

by the termination of any covered employee for reasons "other than cause" during the contractual period of coverage created thereby.   In other words, Siemens created through its multifaceted undertakings "an administrative apparatus that would analyze each employee's situation in light of particular criteria," a hallmark of an ERISA plan. Angst v. Mack Trucks, Inc., 969 F.2d 1530, 1532 (3d Cir. 1992) (discussing distinguishing features of employer undertakings in Pane). Clearly, a reasonable employee would perceive an ongoing commitment by Siemens to provide credit toward accruing pension benefits during this time.   Because there was a clear establishment of specific benefits for an identifiable class of employees over a set period of time, with measures to administer the benefits to the beneficiaries, all of which had to be reviewed on an employee - by - employee basis pursuant to specified criteria, an ERISA Plan was established and maintained. Compare Pane, 868 F.2d at 635 (severance plan for executives created during merger was an ERISA plan where employees were entitled to benefits if terminated for reasons other than cause because each employee's termination had to be analyzed on a case-by-case basis pursuant to certain specified criteria); Bogue, 976 F.2d at 1322-23 (executive parachute program was an ERISA plan because program only became effective upon sale of the employer and the buyer failed to offer employee in question "substantially equivalent employment."); Simas v. Quaker Fabric Corp. of Fall River, 6 F.3d 849, 851 (1st Cir. 1993) (employer's statutory obligation to make severance payments to employees with at least three years of service who were separated within two years of a corporate change of control based on total years of service and eligibility for unemployment compensation constituted on ERISA plan because an ongoing administrative undertaking was required to fulfill employer's obligation).

Because the court is satisfied that Siemens established and maintained an ERISA Plan for transferred employees affording coverage from August 19, 1998, to August 31, 1998, it need not delve into defendants' contentions concerning whether the same legal results would follow if the APA had closed on August 31, 1998.  Any such analysis is better undertaken if and when such matters are no longer hypothetical and become truely ripe for disposition.

8

Finally, it appears that the IRS tax treatment of contingent benefits for actions made illegal under Bellas and the "federal policy" embodied therein was intended to offer protection from an "unanticipated" tax event and a corresponding grace period to Siemens. Such treatment to plan sponsors in and of itself is hardly a basis upon which to anchor a determination regarding whether contingent pension benefits properly are recognized and protected under ERISA. Cf. Bellas, 221 F.3d at 539 (recognizing obligation to enforce rights protected under Section 204(g) notwithstanding potential of adverse tax treatment for employer/plan under then-existing IRS regulations).

For the reasons set forth in the report and recommendation as augmented above, plaintiffs are entitled to summary judgment on defendants' liability as to those class members who did not sign a release.

With regard to the significant number of class members who signed releases, we part paths with the report and recommendation and chart a different course. These employers signed differing forms of releases under what appears to be differing settings and circumstances. From our perspective, the record has been inadequately prepared for a proper analysis of this component of the parties' dispute. Accordingly, we will outline the controlling principles which will guide our ultimate disposition and set the matter down for a hearing on this aspect of the case. The parties will be directed to prepare proposed findings of fact and conclusions of law at the end of that hearing.[2]

As an initial matter, we reject plaintiffs' contention that claims of entitlement to vested pension benefits may not be waived under any circumstances. The authority plaintiffs site to support such a ruling is inapposite.

_____

[2] We will consider permitting the parties to submit this aspect of their dispute as "a case stated" to the extent they (1) can agree on this approach as an alternative to a hearing and (2) sincerely believe the pertinent material for consideration can be presented in a well-organized and efficient manner. See Laurenzano, M.D. v. Blue Cross and Blue Shield of Massachusetts, Inc., 191 F.Supp.2d 223, 225 (highlighting the nature and effect of submitting "a case stated").

9

Plaintiffs' reliance on the questions and answers section of regulations promulgated by the Treasury Department expounding on the protection afforded accrued pension benefits under Internal Revenue Code Section 411(d)(6) is wide of the mark. As apply noted by the Magistrate Judge, this section concerns the transfer of benefits among plans, not whether a cause of action for a disputed pension benefit can be released in exchange for valid and substantial consideration. In this regard Treasury Regulation § 1.411(d)-4 was designed to enforce the "anti-cut back" provision in ERISA and the Internal Revenue Code ("IRC"). See Perreca v. Gluck, 295 F.3d 215, 229 (2d Cir. 2002) ("because plaintiffs' action is one for retirement benefits pursuant to the civil enforcement provision of ERISA, 29 U.S.C. § 1132 - as opposed to an action concerning disqualification of the Sternberger Plan for tax purposes - our analysis of Treasury Regulation § 1.411(d)-4 is guided by the ERISA "anti-cut back" provision. As a practical matter, however, this is a distinction without a difference, since the ERISA and IRC "anti-cut back" provisions prohibit the same conduct and Treasury Regulation § 1.411(d)-4 enforces both provisions."). Thus, it is clearly circular reasoning to suggest that because plaintiff's claim is predicated on the "anti-cut back" provisions of ERISA it is not subject to relinquishment through an otherwise valid release because it is a claim for accrued benefits established and thus protected by the "anti-cut back" provisions of ERISA and the IRC.[3]

Plaintiffs' attempt to find shelter in ERISA's anti-alienation provision equally is unavailing. The United States Court of Appeals for the Third Circuit confronted the issue of whether "waiver" by a plan beneficiary can occur through the execution of a marital settlement agreement in McGowan v. NJR Service Corp., 423 F.3d 241 (3d Cir. 2005). McGowan had elected to receive his retirement benefits in the form of an automatic surviving spouse option, creating a fifty percent survivor annuity for his second wife. He retired under that election and

---

[3]Of course, a plan sponsor's attempt to amend or eliminate a §411(d)(6) protected benefit through a consensual waiver in exchange for participation in an amended or new plan is precisely the evil which Treasury Regulation §1.411(d) was designed to preclude. We however are called upon to address a completely different scenario.

10

began to receive benefits. Id. at 243. A few years later McGowan and his second wife were divorced and entered into a marital settlement agreement. Id. McGowan's second wife waived all right, title and interest to McGowan's pension plan as part of that agreement, and thereafter signed a form consenting to McGowan changing his pension plan election to his first wife as the replacement beneficiary. The plan administrator thereafter informed McGowan that the plan did not permit changes to his prior contingent beneficiary election once he started receiving benefit payments. Undaunted, McGowan again sought to change his beneficiary after his marriage to his third wife a few years later. The plan again refused to recognize McGowan's nomination of his third wife as his new contingent beneficiary and maintained that McGowan's second wife remained the contingent beneficiary under the plan. Id. McGowan thereafter exhausted his administrative remedies and commenced suit seeking a declaration requiring the plan to recognize the second wife's waiver and his subsequent designation of his third wife as the new beneficiary. Id. at 243-44. The district court denied relief and granted the plan's motion for summary judgment. McGowan appealed. Id.

Each member of the panel wrote a separate opinion. Judge Van Antwerpen and Judge Becker agreed that ERISA's anti-alienation clause prohibited the type of waiver under consideration. ERISA is anti-alienation or spendthrift provision provides:

Assignment or alienation of plan benefits.

(1)     Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

29 U.S.C. §1056(d). Both Judge Van Antwerpen and Judge Becker observed that the terms "assignment" or "alienation" have been defined by regulation to involve: "any direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of the plan benefit payment which is, or may become, payable to the participant or beneficiary," 26 C.F.R. § 1.401(a)-13(c) (1) (ii), and observed that the Supreme Court had relied on this regulatory definition in Boggs v. Boggs, 520 U.S. 833, 851 (1997)). Both viewed the case as squarely

11

falling within the concept of assignment or alienation as set forth in the statute and clarified by

the regulation, and on this point the two formed a majority, resulting in an affirmance of the

ruling below. Judge Van Antwerpen opined:

> Similarly, although the common definitions of "waiver" and "assignment" may diverge, McGowan seeks to use the concept of waiver in order to effectuate what is the functional equivalent of an assignment of benefits from his former wife to his current wife. As Judge Easterbrook pointed out in his dissenting opinion Fox Valley, a "waiver" in the ERISA context is not merely a refusal of benefits, but also functions as "an anticipatory gift, to whoever is next in line under the plan's rules." 897 F.2d at 282-83 (Easterbrook, J., dissenting). Rosemary's "waiver" here, if recognized, creates an "indirect arrangement" whereby the plan benefits are transferred to Donna, who in turn gains an "interest enforceable against the plan." These actions therefore fit within the definition of "assignment or alienation" provided in 26 C.F.R. § 1.401(a)-13(c) (1) (II). Thus, even though ERISA does not expressly state that "waivers" are prohibited, recognition of the waiver sought in this case would undermine §1056(d) (1).

McGowan, 423 F.3d at 249 (Van Antwerpen, J.).   Judge Becker set forth a similar view:

> Under [the above referenced] definition, I think that the purported waiver in this case was clearly a prohibited assignment or alienation. Rosemary's waiver was more than a renunciation of her right to benefits under the plan; rather it was an attempt to transfer her interest in the plan to McGowan, with the expectation that he would then be permitted to assign that interest to someone else, as he in fact attempted to do on two separate occasions. I see nothing in the anti-alienation provision that excepts transfers from plan beneficiaries to plan participants, particularly when the plan participant then seeks to transfer that interest to a third party. The purported waiver in this case fits squarely within the definition of assignment or alienation as an "indirect arrangement ... whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan."

McGowan, 423 F.3d at 251 (Becker, J.). Accordingly, Judge Becker agreed "with Judge

Van Antwerpen that the anti-alienation clause prohibits Rosemary's waiver." Id. at 253.[4]

McGowan is instructive with regard to what it did not establish concerning the ability to

---

[4]Both judges agreed that the Supreme Court's opinion in Boggs clearly indicates that actions which may be semantically distinguishable from an "assignment or alienation" may nevertheless be prohibited by ERISA's anti-alienation provision and the "waiver" under consideration was precisely the type of transaction the provision was intended to prohibit.

waive accrued pension benefits: it did not establish an iron clad rule that a cause of action under ERISA seeking to establish entitlement to accrued benefits can never be relinquished pursuant to a knowing and voluntary waiver – such as in the form of a release. To the contrary, all judges agreed that the traditional concept of waiver was distinct from the transactions prohibited by ERISA's anti-alienation provision and the concomitant regulations.

As the magistrate judge noted at page 37 of her report, each member of the court agreed that in general "a waiver is not the same thing as an assignment or alienation. Assignment or alienation involves a affirmative transfer of benefits to another person, whereas waiver usually involves only a refusal of benefits on the part of the individual slated to receive them." McGowan, 423 F.3d at 248 (Van Antwerpen, J.).

When such a waiver of accrued benefits should be recognized was the matter that divided the panel: Judge Van Antwerpen sided with the "minority" view on whether a beneficiary's waiver of his or her benefits should be recognized by a plan administrator, while Judge Becker and Judge Fuentes aligned themselves with the "majority" view. The minority view holds that the intricacy and comprehensive nature of ERISA mandates that plan administrators "need not look beyond the documents on file with the plan to determine whether there has been a valid waiver effectuated in outside private documents." McGowan, 423 F.3d at 245 (Van Antwerpen, J.) (citing Krishna v. Colgate Palmolive Co., 7 F.3d 11 (2nd Cir. 1993); McMillan v. Parrott, 913 F.2d 310 (6th Cir. 1990)). In contrast, the "majority of circuits that have addressed [the] issue have held that such waivers are valid under certain circumstances." Id. at 244-45 (collecting cases from Fourth, Fifth, Seventh, Eighth and Tenth Circuits). This approach distinguishes between a renunciation of accrued benefits and transactions falling within the spendthrift provisions of ERISA protecting against unwise assignment and alienation by a designated beneficiary. Id. at 252-53 (Becker, J.) ("the spendthrift provisions of ERISA are designed to 'insure that the employee's accrued benefits are actually available for retirement purposes,' by preventing unwise assignment or alienation. These provisions focus on the assignment or

13

alienation of benefits by a participant, not the waiver of a right to payment of benefits made by a designated beneficiary.") (quoting Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275, 279 (7th Cir. 1990) (en banc)).  Under this approach the courts have fashioned federal common law to determine whether, and under what circumstances, an individual may validly waive accrued benefits in an ERISA plan.  Id. at 245 (collecting cases in support).  After surveying the various approaches utilized in the area Judge Becker found "nothing that would prohibit us from using our authority to fashion federal common law in this area to develop similarly clear criteria for evaluating purported waivers."  Id. at 255.  Judge Fuentes likewise agreed that "the distinction between waiver and assignment or alienation [is] a significant one" and opined that federal common law should operate to "allow waiver of sufficient specificity to be given effect."  Id. at 256, 255.  From his perspective "federal common law should fill the gap in ERISA concerning the enforceability of waivers" and its development should be guided by and developed consistent with the federal policy reflected therein.  Id. at 259-60.

The releases in the instant case do not present a situation where the participant has engaged in a transaction that indirectly seeks to transfer his or hers accrued benefits to another individual, who in turn would gain an interest enforceable against the plan.  Thus, the "waivers" do not constitute a type of transaction prohibited by ERISA's anti-alienation and assignment provision.  Accordingly, we will follow Judge Becker's and Judge Fuentes' lead and consult the body of federal common law that has addressed when and under what circumstances a waiver of a claim for  accrued benefits will be recognized and deemed effective.

We turn to the issue of when in general a waiver of accrued pension benefits potentially can be consistent with the federal policy embodied in ERISA.  Plaintiffs make much of the proposition that a waiver of any claim they have to PJS benefits cannot be reconciled with their entitlement to accrued pension benefits otherwise available under the Siemens Plans, and the parties' course of dealings clearly shows that the latter was beyond the contemplation of the

14

parties in executing the releases. We believe, however, that a fundamental distinction exists between the nature of plaintiffs' entitlement to these separate plan benefits and plaintiffs' claim to PJS benefits which renders their claim to PJS benefits potentially subject to waiver through a knowing and voluntary relinquishment. We draw support for our position from Lynn v. CSX Transportation, Inc., 84 F.3d 970 (7th Cir. 1996).

In Lynn, the court grappled with the "question of whether a release from liability signed by an employee in exchange for participation in an early retirement program is void in light of the anti-alienation provision of ERISA." Id. at 972. Lynn had worked for CSX for most of his adult life and had accumulated a number of years of service, during which time he had taken a military leave of absence and served in the armed forces. Upon return, he worked for several years in the collective bargaining unit until being promoted to a salaried, non-union position. After fifteen years in that position he retired under the company's early retirement program and executed a "voluntary resignation agreement" in exchange for the right to participate in the early retirement program. Id. The agreement gave Lynn five additional years of service credit and five additional years of age for the purpose of calculating his accrued pension benefits under a defined benefit pension plan. As part of the transaction Lynn signed a general release. Id.

Lynn subsequently contested the calculation of his pension benefits, claiming he should have receive credit for approximately twenty years when he worked as a contract worker. He requested the plan to review his benefit calculation, which it did. The plan stood by its initial determination. After that determination was upheld on administrative appeal, Lynn filed suit in district court. As part of his complaint he added for the first time a claim that he also should have received pension credit for his two years of military service. The district court granted summary judgment in the employer's favor. It held that the plan had properly credited Lynn's years of participation and declined to reach the merits of his claim for military service credit, finding that the claim was a "contestable claim" barred by the release Lynn had signed as part of his resignation agreement. Id. at 973.

15

The Court of Appeals for the Seventh Circuit noted the inherent tension between ERISA's anti-alienation provision and a release that is intended knowingly and intentionally to resolve claims over disputed pension benefits. Id. at 975. After noting the language of ERISA's anti-alienation and assignment provision, the court explained:

> The anti-alienation provision, however, "does not impose a bar on settlement agreements where pension claims are knowingly and intentionally resolved by employees. To apply the anti-alienation provision in [that way] would establish the untenable rule that ERISA prevents plaintiffs from ever entering into a settlement in dispute over lost pension benefits."

Id. at 975 (quoting Lumpkin v. Envirodyne Industries, Inc., 933 F.2d 449, 455 (7th Cir. 1991)). The Lynn court went on to explain and further clarify the distinction between "pension entitlements" and "contested pension claims." It opined:

> Pension entitlements are, without exception, subject to the anti-alienation provision of ERISA. Patterson v. Shumate, 504 U.S. 753, 760 (1992). Contested pension claims, on the other hand, are "simply outside the realm of the provision." Lumpkin, 933 F.2d at 456. The distinction between these two categories is a critical one, and, if the decision of the district court is any indication, one that has not been drawn with sufficient clarity. A pension entitlement arises under the terms of the pension plan itself. A contested pension claim, by contrast, arises under a settlement agreement. A release may prevent a plan participant from asserting claims based on a settlement agreement, but may not bar claims based on pension entitlements.
>
> Our earlier cases have referred to claims arising under settlement agreements as "contestable." We think "contested claims" may be a more accurate phrase as the claims falling in this category are ones that have been contested, either actually or constructively. Where a claim was not previously contested, it has been considered a "contestable claim" if the claimant had actual or constructive knowledge of the claim at the time of signing the release. While this latter type of claim may also be described as "previously contestable," in that it could have been contested and resolved at the time the release was entered into (but was not), such a claim has been constructively contested. A claim may be considered contested where a claimant knew of the claim at the time the dispute was settled. Whether the parties actually wrangled over a particular claim is not determinative. What matters is whether the claimant knew of the claim and knowingly

16

> relinquished it (relinquishment of course including failure to act or to
> raise the issue at all).

Id. at 975.

In applying these teachings, the Lynn court observed that an employee's contention that his or her pension calculation should include a lump-sum payment as raised in a prior case provided a "excellent example" of what the court meant by a "contested claim." In Fair v. International Flavors & Fragrances, Inc., 905 F.2d 1114 (7th Cir. 1990), an employee resolved a sex discrimination suit through a settlement agreement that provided for a lump-sum payment of $85,000, required the employee to stop working immediately but receive an increased salary for a year and a half, and then retire. A release was signed as part of the transaction. Upon retirement, the employee filed suit seeking to have the $85,000 included in earnings for the purpose of pension calculations. The Court of Appeals explained why the matter properly was characterized as a "contested claim" that was subject to waiver:

> We found that Fair had knowledge-actual or constructive-that the
> settlement payment would not be included in her pension calculation.
> This question (whether the settlement payment would be included)
> was a contested claim. Fair knew it was an issue at the time the
> release and settlement agreement were negotiated. She failed to
> include it in the release, and her failure to do so constituted a knowing
> waiver of that claim.
>
> *     *     *
>
> Fair, we said, must have known that her pension was at stake when
> she settled her claim, because the agreement called for her to retire
> in less than two years and to stop working immediately. Under the
> circumstances "the parties certainly should have been aware of any
> impact the settlement agreement might have upon Fair's pending
> retirement benefits." Fair, 905 F.2d at 1116. We also noted Fair
> had a copy of the summary plan description, which indicated that
> "special payments" were not ordinarily included in calculating pension
> benefits.

Lynn, 84 F.3d at 976. Another pertinent factor was that Fair entered into a negotiated agreement in settlement of a potential lawsuit. Throughout the negotiations, she was represented and advised by counsel. Id.

17

After noting that Lynn neither had a lawyer nor negotiated the terms of his separation agreement, the court drew a "central distinction between [Lynn's military service credit] case and its predecessors." Id. In each of the prior cases, the claimants argued that they were entitled to additional pension benefits under the terms of their settlement agreements. In other words, "they were asking the court to interpret, not the language of their pension plans, but the language of the agreements they had entered into." Id. at 976, 77. "Lynn, by contrast, [was] asking the court to interpret the pension plan itself." Id. at 977. In other words, he was seeking to perfect the credit for military service and corresponding increase in benefits to which he believed he was entitled strictly and straightforwardly "under the terms of the plan." Id.

We believe the teachings of Lynn are instructive in this case. There, the court recognized that claims for accrued pension benefits that are based on an instrument or transaction outside the ERISA plan itself can be waived through a voluntary and knowing relinquishment of the claim. And this may occur even where the claim has only been "constructively contested." In contrast, claims for accrued pension benefits that rely solely on the straightforward terms of the ERISA plan in question and do not involve any outside transaction or instrument present a claim based on "incontestable pension rights," which are not subject to waiver. This approach preserves the important purpose reflected in ERISA of assuring that accrued pension benefits are available for those who need them in their retirement years without creating an untenable conflict with the body of law that promotes voluntary and amicable resolution of legal disputes. With these principles in mind, we turn to the matter at hand.

Although not based on an actual prior settlement agreement, plaintiffs' claim to PJS benefits is analogous to the "contestable pension claims" which Lynn recognized can be subject to knowing and voluntary relinquishment. Plaintiffs cannot point directly to the terms of the Siemens' Plans to establish their claim. Instead, they must reference the prior Westinghouse plan and support their claim through an interpretation of and an argument surrounding the legal effect of the APA. As explained by the magistrate judge, the APA is not in itself an ERISA plan.

18

Thus, plaintiffs must rely on a transaction outside the plan itself and interpret a separate instrument in order to establish their claim to entitlement. We believe this squarely falls within the concept of a "contestable pension claim" within the meaning of Lynn, and hold that such claims can be the subject of waiver under appropriate circumstances.

Having determined that plaintiffs' claim for PJS benefits can be effectively relinquished, we turn to consideration of when such a waiver should be recognized as effective. Several federal courts have recognized that federal common law requires "heightened scrutiny" for waivers of ERISA pension benefits. See Laurenzano v. Blue Cross of Massachusetts, Inc., Retirement Income Trust, 191 F. Supp.2d 223 (D. Mass. 2002) ("the second legal principle is the 'heightened scrutiny' that federal common law requires for waivers of ERISA pension benefits.") (collecting cases in support). "Waiver and release are affirmative defenses on which the employer bears the burden. Fed. R. Civ. P. 8(c)." Id. (quoting Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 12 (1st Cir. 1997)). And it is generally understood in this context that "the totality of the circumstances must show that the waiver or release was 'knowing and voluntary.'" Id. (citing Smart v. Gillette Co. Long Term Disability Plan, 70 F.3d 173, 181 (1st Cir. 1995)); see also Lynn, 84 F.3d at 975 ("what matters is whether the claimant knew of the claim and knowingly relinquished it (relinquishment of course including failure to act or to raise the issue at all).").

The United States Court of Appeals for the Second Circuit has identified six factors that are pertinent in ascertaining whether there has been a knowing and voluntary waiver under the "heightened scrutiny" ERISA requires for waiver of claims to accrued pension benefits. These factors, which are not exclusive, include:

> 1)    The education and business sophistication of the plaintiff;
>
> 2)    The rules of the employer and employee in determining the content of the waiver;
>
> 3)    The clarity of the agreement;
>
> 4)    The amount of time plaintiff was given to consider the

agreement;

5)      Whether independent advice, such as that of counsel, was
        available to plaintiff; and

6)      The amount of consideration received in exchange for the
        release or waiver.

Finz v. Schlesinger, 957 F.2d 78, 82 (2d Cir. 1992); see also Morais v. Central Beverage Corp.

Union Employees' Supplemental Ret. Plan, 167 F.3d 709, 713 n. 6 (1st Cir. 1999); Walker v.

Asea Brown Boveri Inc., 214 F.R.D. 58, 65-66 (D. Conn. 2003).  These factors are not intended

to be exhaustive and in examining any issue of waiver under the heightened scrutiny standard the

court is required to examine closely the totality of the circumstances.  Finz, 957 F.2d at 81.[5]

        As previously noted, it is generally recognized that the proponent of a release seeking to

assert it as a defense  to a cause of action bears the burden of proving the effectiveness of the

release.  See, e.g., Rivera-Flores, 112 F.3d at 12; Cf. Coventry, 856 F.2d at 524 ("application of

[the totality of the circumstances] test to the present case leads us to conclude  that there has not

been a sufficient actual showing that [the plaintiff] executed the [release] form knowingly and

willingly.").  Once  a defendant demonstrates that the release effectively encompasses  the claim

in question, the plaintiff then bears the burden of proving he or she did not voluntarily and

---

[5]The above factors are similar to those employed in examining the totality of the
circumstances surrounding a release of civil rights.  See e.g. Pierce v. Atchison Topeka & Santa
Fe Railway Co., 65 F.3d 562, 570 (7 th Cir. 1995).  Pertinent factors in this area include: (1) the
employee's education and business experience; (2) the employee's input in negotiating the terms
of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for
deliberation before signing the release; (5) whether the employee actually read the release and
considered its terms before signing it; (6) whether the employee actually read the release and
considered its terms before signing it; (7) whether the employee was represented by counsel or
consulted with attorneys; (8) whether the consideration given in exchange for the waiver
exceeded the benefits to which the employee was already entitled by contract or law; and (9)
whether the employee's release was induced by improper conduct on the defendant's behalf.  Id.
at 571-72; accord Coventry v. U. S. Steel Corp., 856 F.2d 514, 524 (3d Cir. 1988) (same).

20

knowingly enter into or consent to it. Pierce, 65 F.3d at 571-72.[6]

In the end, "the inquiry into waiver consists of two questions: whether a party actually knew she was relinquishing a benefit, and whether she acted voluntarily in doing so." Smart, 70 F.3d at 182. And "answering these companion questions is a fact-intensive exercise" in which the court is to give careful consideration to the totality of the circumstances surrounding the transaction. Id.; Coventry, 856 F.2d at 523-24. Summary judgment is not an appropriate vehicle for such a fact-intensive inquiry and resolution. Accordingly, defendant's motion for summary judgment will be denied and further proceedings consistent herewith will be scheduled in due course.



David Stewart Cercone
United States District Judge

---

[6]While there appears to be inherent tension between a proponent's obligation to demonstrate that contestable claims for accrued pension benefits were within the scope of a general release executed at the termination of employment and a plaintiff's obligation to prove that his or her consent to an otherwise valid release was not knowing or voluntary, the division of proof along these lines strikes us as entirely proper. Defendants seek to avail themselves of an affirmative defense through the operation of the waivers in question. As such, they are the proponent of the release and rightfully carry the burden of demonstrating it encompasses any particular claim in question. Under the heightened scrutiny required to waive a contestable claim for accrued pension benefits, a defendant must demonstrate that the totality of the circumstances shows that the release was "knowing and voluntary," which necessarily entails a showing of knowledge, actual or constructive, that the claim was within the scope of the release and termination agreement. Lynn, 84 F.3d at 976. In contrast, plaintiff is in the best position to prove that circumstances external to the claims and instrument in question demonstrate the lack of knowing or voluntary consent. Pierce, 65 F.3d at 572 ("thus, after the employer raises the existence of a release as a defense to a discrimination suit, the burden rests on the plaintiff to challenge specifically his voluntary and knowing consent to the release").

cc:    John T. Tierney, III, Esquire
David P. Rodes, Esquire
Robin M. Graziano, Esquire
Theodore Goldberg, Esquire
Goldberg Persky & White, PC
1030 Fifth Avenue, Third Floor
Pittsburgh, PA 15219

William T. Payne, Esquire
1007 Mt. Royal Boulevard
Pittsburgh, PA 15223

Maria Greco Danaher, Esquire
Frederick W. Bode, III, Esquire
Dickey McCamey & Chilcote, PC
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402

Robert Holland, Esquire
Dana L. Rust, Esquire
David F. Dabbs, Esquire
McGuire Woods, LLP
One James Center
901 East Cary Street
Richmond, VA 23219

22